ORIGINAL

Approved: _William Harrington / Michael Bosworth_
                WILLIAM J. HARRINGTON
                MICHAEL S. BOSWORTH
                Assistant United States Attorneys

Before:    HONORABLE DEBRA FREEMAN
              United States Magistrate Judge
              Southern District of New York

# 10 MAG 1135

- - - - - - - - - - - - - - - - x
                                          :
                                          :       SEALED
                                                  COMPLAINT
UNITED STATES OF AMERICA           :
                                                  18 U.S.C. §§ 1001,
        - v. -                            :       1343 & 1956; 15
                                                  U.S.C. §§ 80b-6 &
KENNETH STARR, and                 :       80b-17; 26 U.S.C.
ANDREW STEIN,                                     §7206(1)
                                          :
        Defendants.                       :       COUNTY OF OFFENSE:
                                          :       NEW YORK
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT BERANGER, being duly sworn, deposes and says
that he is a Special Agent with the Internal Revenue Service-
Criminal Investigative Division (the "IRS-CID") and charges as
follows:

## COUNT ONE
### (Wire Fraud Scheme To Obtain Property)

        1.   From at least in or about January 2008, through
and including in or about April 2010, in the Southern District of
New York and elsewhere, KENNETH STARR, the defendant, and others
known and unknown, unlawfully, willfully, and knowingly, having
devised and intending to devise a scheme and artifice to defraud,
and for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, did transmit
and cause to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce, any
writings, signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, STARR marketed his
services as an accountant and financial adviser to clients,
gained control over millions of dollars belonging to his clients,
and then misappropriated millions of dollars of his clients'

assets for his own personal use, including to purchase himself a
new, multi-million dollar residence.

(Title 18, United States Code, Section 1343.)

## COUNT TWO
### (Fraud By An Investment Advisor)

2.    From at least in or about January 2008, through
and including in or about April 2010, in the Southern District of
New York and elsewhere, KENNETH STARR, the defendant, and others
known and unknown, unlawfully, willfully, and knowingly, used the
mails and other means and instrumentalities of interstate
commerce, directly and indirectly, (1) to employ a device,
scheme, and artifice to defraud a client and prospective client;
(2) to engage in any transaction, practice, and course of
business which operated as a fraud and deceit upon a client and
prospective client; (3) to act as principal for his own account,
knowingly to sell a security to and purchase a security from a
client, and acting as broker for a person other than such client,
knowingly to effect a sale and purchase of any security for the
account of such client, without disclosing to such client in
writing before the completion of such transaction the capacity in
which he was acting and obtaining the consent of the client to
such transaction; and (4) to engage in an act, practice, and
course of business which was fraudulent, deceptive, and
manipulative, to wit, STARR persuaded clients to invest money
with him by promising to invest their monies in safe investments
and then diverting the monies both directly to himself and to
risky investments in which he, his wife, and his close associates
held undisclosed financial interests.

(Title 15, United States Code, Sections 80b-6 & 80b-17.)

## COUNT THREE
### (Money Laundering)

3.    From at least in or about January 2008, through
and including in or about April 2010, in the Southern District of
New York and elsewhere, KENNETH STARR, the defendant, and others
known and unknown, unlawfully and willfully, and knowing that the
property involved in a financial transaction represented the
proceeds of a form of unlawful activity, did conduct and attempt
to conduct a financial transaction which in fact involved the
proceeds of specified unlawful activity, to wit, wire fraud as
charged in Count One of this Complaint, with the intent to
promote the carrying on of specified unlawful activity, and
knowing that the transaction was designed in whole and in part to

conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, before misappropriating his clients' funds, STARR wired those to an attorney's trust account to make it appear as if the funds were being directed to lawful and appropriate investments.

(Title 18, United States Code, Section 1956.)

## COUNT FOUR

### (False Statements in an IRS Filing)

4.    On or about April 10, 2008, in the Southern District of New York, ANDREW STEIN, the defendant, unlawfully, willfully, and knowingly, made and subscribed a statement and document which contained and was verified by a written declaration that it was made under the penalties of perjury, and which he did not believe to be true and correct as to every material matter, to wit, STEIN signed and submitted an IRS document titled Collection Information Statement for Wage Earners and Self-Employed Individuals (hereinafter, "Form-433-A") that failed to disclose, in response to questions that called for him to disclose such information, the existence of Wind River, LLC; a bank account for Wind River, LLC; his use of credit cards in the names of third parties; and his rental of a luxury summer home in Bridgehampton, New York.

(Title 26, United States Code, Section 7206(1).)

## COUNT FIVE

### (False Statements To A Federal Officer)

5.    On or about November 9, 2009, in the Southern District of New York, ANDREW STEIN, the defendant, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, in an interview with a Special Agent of the Internal Revenue Service and a Criminal Investigator with the U.S. Attorney's Office for the Southern District of New York, STEIN made the following false statements and concealed and covered up facts that were material to the investigation: (1) STEIN falsely denied knowing Wind River, LLC; Associate-2; Associate-8; and Associate-9; and (2) STEIN falsely stated that he was not an officer of Wind River,

3

LLC.

(Title 18, United States Code, Section 1001.)

The bases for my knowledge and the foregoing charges are in part as follows:

6.    I am a Special Agent with IRS-CID.  I have worked at the IRS-CID for more than 18 years, and currently serve as a Special Agent in IRS-CID's New York office.  Since becoming a Special Agent with IRS-CID, I have conducted investigations involving public corruption, money laundering and fraud, and have conducted or participated in physical surveillance, the interview of witnesses, the surveillance of meetings involving the use of confidential sources, the execution of search warrants, debriefings of sources, the review of taped conversations, and the analysis of bank records.  I have participated in the execution of at least 20 search warrants, virtually all of which involved searches for financial records and related documents, and have frequently seized documents and other financial records as evidence.  I have been personally involved in the investigation of this matter.  In the course of this investigation, I have spoken with other agents and analysts of IRS-CID, as well as other law enforcement officers, and I base this Affidavit, in part, on those conversations.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause to arrest, it does not include all of the facts that I have learned during the course of the investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## OVERVIEW OF STARR'S CRIMINAL SCHEMES

7.    As set forth below, I believe, based upon the investigation I have conducted to date that there is probable cause to believe that KENNETH STARR, the defendant, has utilized his firm, STARR & COMPANY, LLC, to commit fraud.  STARR & COMPANY, LLC purports to be in the business of managing the assets of, and providing financial planning advice to, its high net-worth, celebrity clients.  It owns Starr Investment Advisers, LLC, which is a registered investment adviser (collectively, "STARR & CO.").  STARR & CO.'s only office is located in Manhattan, New York.  The services provided by STARR through these two entities include the preparation of tax filings, bill payment, and assisting wealthy individuals identify suitable investments.  Despite his repeated promises to protect his

4

clients' interests, STARR has in fact systematically defrauded his clients. He used his access to famous and powerful clients to burnish an image of trustworthiness, leading his clients to entrust him with management and control of their financial affairs. In some cases, he assumed total control over his clients' financial lives by collecting their earnings, investing their savings, and paying their bills.

8. STARR defrauded many of his clients by engaging in at least two types of schemes. First, on some occasions, STARR solicited investments from his clients in entities or businesses that he represented as sure deals, and then diverted all or some of the investment monies to himself, to his close associates, or to risky investments in which he, his wife, and/or his close associates held undisclosed financial interests. These associates included, among others, his son ("Associate-1"); ANDREW STEIN, the defendant, whose background is described more fully below; a former national official of a major political party ("Associate-3"); and a partner at a prominent national law firm ("Associate-4").[1] Second, where STARR exercised direct control over the personal bank accounts of his clients, STARR used that control to make unauthorized transfers of funds to himself and/or his closest associates. Furthermore, when STARR's clients made demands for payments that STARR could not meet, he transferred funds from one client to another client. At least to that extent, I believe STARR's fraudulent conduct was characteristic of a "Ponzi" scheme.

9. Based on the information set forth below, as well as conversations with other law enforcement officers, I believe that STARR has engaged in fraudulent activity involving at least $30 million.

## STARR & CO.

10. On or about March 10, 2010, I participated in an interview of KENNETH STARR, the defendant, at the U.S. Attorney's Office for the Southern District of New York. During that interview, STARR stated the following, among other things:

a. STARR is a graduate of Brooklyn Law School and has an L.L.M. in tax from New York University Law School. He is

---

[1] Based on a search of the New York State attorney directory, I have learned that Associate-4 is registered as an attorney admitted to the bar of New York and that he practices law at a prominent national law firm.

admitted to the New York bar, but does not practice law.  He owns and operates STARR & CO. The business has three areas of expertise, which he refers to as family office, taxes and consulting. The company employs between 65-70 persons at its sole New York location. The company provides services for approximately 200 paying clients and prepares about 1,500 tax returns per year for the clients and their families.

    b.    The "family office" serves clients who need one location to receive mail and financial information, including bills and bank statements.  STARR & CO. provides bookkeeping services to these clients by paying bills and tracking financial obligations.  STARR & CO. is involved in monitoring assets, investments, accounts payable and billing.  It also provides children of its clients with allowance funds and prepares their tax returns.

    c.    The tax area of the firm handles sophisticated client tax issues.

    d.    The consulting area handles corporate and personal consulting matters, including corporate structure, corporate expansions, and domestic and international business investments.

## STARR USED STARR & CO. TO DEFRAUD CLIENT-1

    11.    On or about May 13, 2010, I participated in an interview of a client of STARR & CO. ("Client-1").  At the interview, I learned the following:

    a.    Client-1 is a former hedge-fund manager and well-known philanthropist.

    b.    In or about March 2009, Client-1 retained KENNETH STARR, the defendant, for help with accounting for her philanthropic foundation, preparation of her personal income tax returns and other tax filings, and bill-paying.  STARR discussed the possibility of offering investment advice and access to hedge funds.  Client-1 demurred because she had her own connections in the financial world and did not need STARR's assistance.

    c.    Starting sometime in or about the late Winter or Spring of 2009 and continuing through in or about April 2010, STARR had authority and control over Client-1's personal bank accounts, as well as the accounts for her foundation.  From time to time, he left her voice messages that she perceived to be regarding potential investment opportunities, but she never

6

actually discussed any investments with him.

d.   In or about early 2010, Client-1 grew increasingly concerned about the quality of services that STARR was providing.  For example, she had asked for his help in connection with a real estate transaction but encountered constant delays in the transaction that were hard to explain and that were attributable to STARR.  On occasion, STARR blamed third parties such as banks for the delays, but Client-1 subsequently learned from those third parties that STARR's explanations were, in fact, false.

e.   Due to her growing concerns, Client-1 eventually instructed bank representatives at HSBC to notify her before any wire transfers were sent from her accounts.  In or about the middle of April 2010, a bank representative notified Client-1 that STARR had directed a wire transfer of $750,000 to the account of Associate-4.  Client-1 knew nothing about this transaction and she accordingly directed the bank to stop it.

12.   On or about May 13, 2010, I spoke to an attorney who represents Client-1 in connection with certain real estate matters ("Client-1's Attorney").  Based on the interview I learned the following:

a.   Client-1 notified Client-1's Attorney of the unauthorized $750,000 wire transfer initiated by KENNETH STARR, the defendant.  Client-1's Attorney called Associate-4 and asked why STARR sent $750,000 to him.  Associate-4 replied that STARR was buying himself an apartment at a location on the Upper East Side in New York, NY.  Associate-4 suggested that maybe Client-1 was loaning STARR the down payment.  Client-1's Attorney informed Associate-4 that Client-1 was not making any such loan.

b.   Client-1's Attorney spoke to Associate-4 later that day.  Associate-4 informed Client-1's Attorney that he had talked to STARR about the transfer.  STARR said that he would take care of it.

c.   Client-1's Attorney and his law partner called STARR.  In Client-1's Attorney's view, STARR basically claimed to have already caught the error on his own and reversed it.  Specifically, STARR stated that the monies were supposed to come from a particular client, whom he named.  STARR claimed that he only discovered the error late in the day after reviewing the many wire transfers that he signed that day.  STARR stated that he was shocked that the money came from Client-1.  STARR claimed to have only spoken to a STARR & CO. office assistant about this

and that he directed that assistant to call the bank.

        d.   Client-1's Attorney learned from a law partner that the partner subsequently called Associate-4. Associate-4 stated that he was unaware of any transaction involving the purported client whom STARR had named.

        e.   After this event, Client-1 directed her attorneys to end the relationship with STARR. Upon reviewing her bank records, Client-1's Attorney and his law partners learned that approximately $2.2 million was wired from Client-1's accounts to Associate-4's account since the inception of her relationship. Of the funds that went to the Associate-4 account, Client-1 had authorized only approximately $500,000 in connection with the real estate transaction mentioned above. The remaining wires were unauthorized. Client-1's Attorney raised this issue with Associate-4 and ultimately the misappropriated funds were returned to Client-1 via bank checks.

        13.   Based on a review of records for Associate-4's bank account ending in 2778 ("Associate-4 2778 Account"), I have learned that the account is an attorney trust account. It is not the trust account, however, utilized by the law firm of which Associate-4 is a partner. These bank records also show the following additional transactions from Client-1's accounts to the Associate-4 2778 Account:

              a.   $200,000 on or about August 12, 2009;
              b.   $200,000 on or about October 8, 2009;
              c.   $550,000 on or about October 9, 2009;
              d.   $250,000 on or about October 13, 2009;
              e.   $250,000 on or about November 2, 2009;
              f.   $250,000 on or about November 13, 2009;
              g.   $250,000 on or about November 18, 2009; and
              h.   $250,000 on or about November 25, 2009.

These bank records thus corroborate the claim of Client-1's Attorney and his law partners that monies totaling $2.2 million were transferred out of Client-1's account, of which only approximately $500,000 had been authorized.

## STARR USED STARR & CO. TO DEFRAUD CLIENT-2

        14.   In connection with this investigation, I participated in an interview of Client-2 at the U.S. Attorney's Office. Based on that interview, I have learned the following:

        a.   Client-2 is an actress.

       b.    Years ago, Client-2 had retained KENNETH STARR, the defendant, for bill paying services, tax preparation, and investment advice. He continuously provided those services to Client-2, except for a period between the late 1990s and in or about 2002. Client-2 had a close and long-standing relationship with STARR.

       c.    For many months in recent years, but sporadically in the last 6 months, STARR sent Client-2 monthly account statements detailing her finances. Client-2 found them to be organized in a very confusing manner, making it hard to understand what STARR was doing.

       d.    Sometime in or about 2009, Client-2 showed her friend ("Client-2's Friend"), who has financial expertise, the statements. The statements raised concerns for Client-2's Friend. For example, at one point Client-2's Friend compared statements for a three-month period and noticed that her assets had dropped by a significant amount and no one had notified her. Client-2 and Client-2's Friend started discussing how to assert greater control over Client-2's monies. At one point, Client-2 authorized Client-2's Friend to instruct STARR & CO. to move all of her assets into very safe investments. Client-2's Friend gave this message to a STARR & CO. employee ("Associate-5"), the employee responsible for managing Client-2's accounts day-to-day.

       e.    Over time, a number of things happened that gave Client-2 concern. For example, at some point in or about the end of 2009 or the beginning of 2010, Client-2 stopped receiving statements from STARR.

       f.    Sometime in or about the weekend of April 17, 2010, STARR left a series of voice mails for Client-2 stating that he wanted to check in and see how she was doing. In those messages, STARR did not refer to any upcoming financial transactions. Client-2 did not call him back because she knew Client-2's Friend was dealing with STARR on a number of issues.

       g.    On or about April 23, 2010, Client-2 received a call from a representative of the bank at which she maintains her accounts. In substance, the bank representative asked whether Client-2 knew why $1,000,000 was wired to Associate-4 on or about April 13, 2010. In fact, this was the first that Client-2 had even heard about the transaction.

       h.    On or about April 26, 2010, Client-2, accompanied by her lawyers, went to the sole office of STARR &

CO. to confront STARR.  STARR was asked why $1 million was wired to Associate-4.  STARR replied that it was an investment.  He said the investment did not happen and went away.  He did not specify what the investment was for.  STARR was asked to contact Associate-4 to have the money returned.  STARR returned to the room several times to say that Associate-4 was unreachable and unavailable by phone or email.  At some point, a STARR & CO. employee came in and said that he had been told by STARR that the $1 million was transferred to purchase a two-week certificate of deposit.  STARR reentered the room and directed the employee to leave.  Client-2 and her lawyers used a blackberry to search for a lawyer named Associate-4 and found a number at the law firm of Associate-4.  Client-2 then entered a private conference room and called Associate-4's number.  She was put right through to Associate-4.  She informed Associate-4 that she had a problem because a large portion of her savings was in his account.  He replied that he did not know the money belonged to her and that he thought it belonged to STARR.  He further said that he got really mad at STARR and told him "you bungled me up on this."  He promised to get the money back to her.  Associate-4 ended the call by stating that he would not tell STARR that they had spoken.

     i.    Client-2 had a series of conversations with Associate-4 over the course of the day in which he updated her on his progress in returning the money.  Eventually, $1 million was transferred back into her account.

## STARR REPAID CLIENT-2 WITH MONEY BELONGING TO CLIENT-3

     15.    Based on documents obtained from Client-2's bank, I have learned that on or about April 26, 2010, a sum of $1 million was wired to Client-2's account ending in 1177 (the "Client-2 1177 Account") from an account held by Associate-4 at another bank ending in 2778 (the "Associate-4 2778 Account"). Just prior to that transfer, the Associate-4 2778 Account had received a $1 million transfer from an account held by Client-3, a former executive of a talent agency, and his wife.  Thus, although $1 million was returned, it does not appear to have been a return of Client-2's funds but rather appears to have been funded from an account of another client of KENNETH STARR, the defendant.

## IN OR ABOUT APRIL 2010, STARR PURCHASED A NEW CONDOMINIUM FOR AT LEAST $7.5 MILLION USING THE FUNDS OF HIS CLIENTS

     16.    Based on public filings, I have learned that an entity called Colcave, LLC, purchased an apartment on the Upper

East Side of Manhattan (the "New York City Condo") on or about April 16, 2010 for a total purchase price of at least $7.5 million. KENNETH STARR, the defendant, signed on behalf of Colcave, LLC. I have also learned from other clients of STARR, who are described in greater detail below as Client-6 and Client-7, that they recently received a change of address notice from STARR providing his new home address as the New York City Condo.

17. An advertisement for this unit on "zillow.com" provides the following description of the apartment:

> Gorgeous Condominium at [condominium development]. This 5 bedroom, 6.5 bath residence offers a sophisticated lifestyle befitting the most discriminating buyer. Rare for Manhattan is the indoor 32 ft. lap pool next to a 36 x 27 ft recreation room with a wet bar and adjacent prep kitchen and full-sized media room. The main floor features 1500(approx) sq ft garden, custom kitchens equipped with a Fisher and Paykel grill, Franklin Chef refrigerator and Viking appliances. Thermadour masterpiece oven, spacious pantry storage unit and limestone topped breakfast island. Wall of floor-to-ceiling windows, fireplace and direct access to the garden. The last level has 4 additional bedrooms complete with spa-like baths and walk-in closets.

18. Based on bank records for the Associate-4 2778 Account, I have learned about the following deposits and withdrawals, which appear to be related to STARR's purchase of the apartment:

a. On or about January 14, 2010, the Associate-4 2778 account received a wire transfer of $800,000 from Client-4, a step-child of a deceased heir to a business fortune.

b. On or about the next day, January 15, 2010, $750,000 was wired from the Associate-4 2778 Account to a New York City law firm ("Law Firm 1").

c. Between on or about April 13, 2010 and on or about April 15, 2010, the following monies owned by the following persons/entities were wired into the Associate-4 2778 Account on or about the dates indicated below:

| Date | Origin of Funds | Amount |
|------|-----------------|--------|
| April 13, 2010 | Client-2 | $1,000,000.00 |

| April 13, 2010 | Oak Spring Farms LLC | $ 750,000.00 |
| April 13, 2010 | Client-4 | $ 250,000.00 |
| April 15, 2010 | Oak Spring Farms LLC | $4,250,000.00 |
| April 16, 2010 | Oak Spring Farms LLC | $ 750,000.00 |
| April 16, 2010 | Account-1 | $ 145,000.00 |
| April 16, 2010 | Account-2 | $ 105,000.00 |

Based on a conversation with an investigative analyst with the Manhattan District Attorney's Office, I have learned that, on or about May 25, 2010, an attorney representing both Oak Spring Farms LLC and Client-5, an elderly heiress, indicated that Oak Spring Farms LLC is owned by Client-5. That attorney also indicated that he did not authorize any transfer of funds from Oak Spring Farms LLC to pay for an apartment for STARR in April 2010 and that he was unaware of any such authorization by his nearly 100-year-old client, Client-5. Finally, with respect to Account-1 and Account-2, I have reviewed wire transfer archive records showing that the above-described wires from these two accounts - which may be accounts of clients of STARR & CO. - originated with STARR & CO.

        d.    Bank records show that these funds were then disbursed to purchase a new residence through Colcave, LLC, for KENNETH STARR, the defendant. During that same time period, on or about April 13 through on or about April 16, 2010, the following transfers were made from the Associate-4 2778 Account on or about the dates indicated below:

| Date | Destination of Funds | Amount |
|------|---------------------|--------|
| April 14, 2010 | UBS Financial Services | $1,250,000.00 |
| April 16, 2010 | Law Firm 1 | $6,000,000.00 |

Based on financial documents, I have learned that the $1.25 million UBS Wire described above went to an account ending in 994 held in the name of Kenneth Starr ("STARR 994 Account"). I have further learned that the following monies were withdrawn from the STARR 994 Account by check or wire on or about the dates indicated below:

| Date | Destination of Funds | Amount |
|------|---------------------|--------|
| April 16, 2010 | Law Firm 1 | $500,000 |
| April 19, 2010 | Individual listed as manager of the company who developed the New York City Condo | $145,000 |

The bank that maintains the Associate-4 2778 Account provided a "wire transfer archive" in connection with the payment of $6,000,000 on or about April 16, 2010. It lists as the originating beneficiary information "Colcabe, Kenneth I Starr." I believe that "Colcabe" is a typographical error for "Colcave," and that this transaction pertains to the purchase of the New York City Condo.

## STARR USED STARR & CO. TO DEFRAUD CLIENT-6 AND CLIENT-7 OF ALMOST $14 MILLION

19.    On or about May 11, 2010, I participated in interviews of Client-6 and his wife, Client-7. During those interviews, and as set forth in greater detail below, I learned that between on or about February 7, 2008, and on or about October 1, 2008, Client-6 and Client-7 invested approximately $13,875,000 in investments recommended by KENNETH STARR, the defendant. For the reasons set forth below, I believe that STARR obtained these funds by fraud, and that he did not invest them as promised. In fact, in some cases, STARR did not invest the monies but instead lent them to his associates without the knowledge of Client-6 or Client-7. In other cases, STARR simply diverted portions of the invested funds to himself or his associates. And in still other cases, STARR invested the monies in projects in which his wife, his son, or his close associates (including ANDREW STEIN, the defendant) had an undisclosed financial interest – projects that were riskier than the sure deals STARR had promised.

20.    During the interview of Client-6, I learned the following:

a.    Client-6 is a jeweler whose flagship store is located in Manhattan.

b.    In about May 2006, Client-6 presented his jewelry for sale at a charity event hosted by a prominent philanthropist on behalf of a non-profit organization. At the event, Client-6 met KENNETH STARR, the defendant, for the first time.

13

c.    On or about the next day, STARR entered the flagship store and purchased a watch for approximately $70,000. STARR began cultivating a close personal relationship with Client-6 who eventually came to consider him "like a brother." Initially, they met approximately once per month and eventually as frequently as once per week.    STARR came to know Client-6's wife, Client-7; and Client-6 came to know STARR's fiancée and later wife ("STARR's Wife").    STARR and STARR's Wife invited Client-6 and Client-7 to their wedding, though Client-6 and Client-7 did not attend.    STARR also became a regular customer of Client-6's business, purchasing over $400,000 in jewelry in subsequent months.[2]    Client-6 learned from STARR that he managed money and investments for wealthy individuals.    In the early stage of his relationship, STARR never pitched any investments to Client-6.

d.    On or about June 15, 2006, Client-6 was arrested by the Drug Enforcement Administration and the IRS.[3] The arrest pertained to statements that Client-6 made to law

_____

[2]    Based on records maintained by Client-6's business, I have learned that STARR purchased, among other items, the following:

| | |
|---|---|
| $13,000 | rose gold pave diamond chandelier earrings |
| $10,400 | yellow gold pave diamond lace patterned pendant on a 22" yellow gold link chain |
| $32,000 | square emerald cut diamond pendant |
| $10,800 | a ladies diamond and jade pendant |
| $70,227 | diamond bracelet |
| $77,490 | five time zone watch, 40mm 18K yellow gold case, black dial, and a 3.2ct diamond 18k yellow gold bezel |
| $16,256 | ladies round brilliant cut diamond chandelier earrings |
| $32,215 | ladies two row diamond wedding band |

[3]    I have learned from a conversation with an IRS investigator that Client-6 was initially charged with money laundering in connection with a narcotics case prosecuted in the Eastern District of Michigan.

14

enforcement agents about jewelry that was purchased in cash by certain individuals alleged to have been members of a narcotics conspiracy. Client-6 admits that he lied to those officers and he subsequently pled guilty to obstruction of justice.

e. In or about late 2007 and early 2008, Client-6 became concerned that his business would suffer while he was serving any jail time imposed as a result of this conviction and that his wife and children would face financial difficulties.

f. At about this time, and a little less than 2 years after they first met, STARR told Client-6 that he had many investments but that he only permitted his close friends to invest in them. STARR told Client-6 that he was "almost ready" to allow Client-6 to begin investing now that they were friends. STARR added that he would recommend projects in which he and his friends would also be investing and that he (STARR) only invested in sure deals.

g. Several months later, in or about January 2008, STARR invited Client-6 and Client-7 to the principal office of STARR & CO. to discuss investments. During the meeting, STARR told Client-6 and Client-7 that by investing with him they would make five to ten times on their money. STARR further stated that if Client-6 went to jail, his wife would be very rich. STARR further described a company called "Universal" that was in the business of manufacturing voting machines. He described a second investment in a venture he referred to as "Jinti," which Client-6 understood had something to do with the Chinese internet, and a third investment called Martini Park. STARR said that he was very excited about the investments and that he and his friends were investing. In subsequent meetings, STARR repeated these points. His son, Associate-1, also attended some meetings and expressed excitement about the investments.

h. Client-6 decided to invest with STARR. He thought it was the right time given his personal circumstances and STARR's representations that these were secure investments. He discussed with STARR the fact that his cash flow was dependent on jewelry sales. STARR said he could invest in tranches as the money becomes available. STARR also stated that in 2009 there would be big results and that when Client-6 is in jail his wife would see big results.

i. Between in or about February 2008 and in or about October 2008, Client-6 directed his wife, Client-7, to send monies to STARR for investments. STARR had recommended that Client-6 and Client-7 hold the assets in Client-7's name because

15

she would need to have authority over them while Client-6 was in jail. He also stated that the other investors would not want to be associated with Client-6 due to his criminal conviction. STARR instructed them to create an investment vehicle, which Client-6 and Client-7 named "Challenger III, LLC," to funnel the investments. Using Challenger III, Client-6 and Client-7 invested $13,875,000 at STARR's recommendation. In connection with these investments, Client-6 and Client-7 went to the principal office of STARR & CO. on multiple occasions and signed documentation. They did not read the documents or have a lawyer look at them because they believed that STARR was a friend and a lawyer and that he was looking out for their interests.[4]

       j.   Client-6 does not recall any conversation in which STARR stated that he or anyone else would receive a fee in connection with his investments.

       k.   Sometime in 2008, Client-6 also asked STARR to recommend someone who could audit the finances and operations of his businesses. Client-6 wanted the auditor to make sure that everything was being done correctly so that he did not have any problems in the future. STARR responded, this is what "we do," referring to internal audits, and STARR offered to do an internal audit. Client-6 agreed to retain STARR, who thereafter charged approximately $50,000 per month, and claimed that several people were working on the project. As of the date of the interview, however, STARR had not delivered any work product from the audit. STARR claimed that Client-6 owed him over $80,000 in connection with this audit, and STARR has refused to pay for jewelry that he received in that amount.

       l.   On or about January 20, 2009, Client-6 surrendered to the Bureau of Prisons to begin his jail term.

      21.   During the interview of Client-7, I learned the following:

       a.   In 2008, Client-7 knew that her husband, Client-6, began investing monies with KENNETH STARR, the defendant. She did not agree with the investments, but believed

---

[4] I have reviewed documents that STARR gave Client-7. In connection with some of the investments, but not all, STARR gave her documents that contained warnings that she had not been furnished with any oral representation or oral information in connection with the offerings and that, among other risks, she could bear a complete loss of her investment.

16

it was her husband's decision.  Client-6 made all of the
investment decisions with STARR.

       b.   At about the time that her husband, Client-6,
went to prison in or about January 2009, she assumed control over
his business.  Shortly thereafter, she began preparing for the
filing of taxes.  Her accountant directed her to get K-1s for the
investments with STARR.  She contacted STARR in order to receive
tax documentation - specifically, K-1s - for the investments that
Client-6 and Client-7 had made.  She also needed money to pay
taxes due.

       c.   STARR told Client-7 that it was too early to
get any money.  He also gave her the "run around" on providing
the K-1 statements.  He told her that she should contact his
attorney, Associate-4.  Client-6 called Associate-4.  Associate-4
replied that he did not know what she was talking about, and that
he would have to talk to STARR before getting back to her.
Associate-4 never called her back.  Client-7 also continued to
press STARR for funds, but he offered shifting explanations for
why he could not give her any funds.

       d.   At some point in or about early 2009, STARR
directed Client-7 to sign some documents in order to get repaid.
She did not read the documents, but understood that STARR & CO.
would receive an 11% commission for the payment.  This was the
first and only time that she recalled any discussion of a
commission paid in connection with any STARR investments.  She
eventually received K-1s or similar documents for some
investments, but not for others.

       e.   At some point, Client-7 and Client-6 decided
to begin tape recording their conversations with STARR about
their efforts to obtain monies back from STARR.

## STARR REBUFFED ATTEMPTS BY CLIENT-6 AND CLIENT-7 TO OBTAIN RETURNS ON THEIR INVESTMENTS

      22.   I have reviewed the consensually recorded
conversations obtained by Client-6 and Client-7 after on or about
October 28, 2009.  According to Client-7, the calls began at a
point when KENNETH STARR, the defendant, had promised a return on
her investment with Universal Solutions LLC.  Based on my review
of the recordings, I have learned that STARR repeatedly promised
that Client-6 and Client-7's investment in Universal
Identification Solutions was about to realize a multi-million
dollar pay-off, but then offered a series of shifting and far-
fetched explanations for why the payment could not be made.

According to Client-6 and Client-7, as of on or about May 11, 2010, they still had not received any payments in connection with this investment. The recordings also evidence Client-7's attempts to get documentation on certain of her investments. Specifically, sometime after in or about January 2009, STARR informed her that two of the investments were actually loans, and Client-7 then undertook efforts to obtain copies of any loan agreements. The following are descriptions of some of the recorded conversations with STARR:[5]

a. On or about Friday, November 6, 2009, at approximately 9:08 a.m., Client-7 spoke by telephone with STARR. STARR told her that his son "just went to the city with [Associate-6]. They're supposed to get checks at about 10:30/11:00 o'clock today and then they're going to the bank." STARR further stated that his son "has glued himself to [Associate-6]."[6]

b. On or about Monday, November 9, 2009, at approximately 3:25 p.m., they spoke again. STARR stated that [Associate-6] had been in the hospital from Thursday through Sunday at 10:30 p.m. He further stated that "we have been dealing with them, with the minister of Venezuela and with this other guy who is the broker, and they're just working out the final details as we speak." Client-7 asked, "But I thought he [Associate-6] had the checks already." STARR replied that "he did but he wasn't permitted, he's still part of these characters, so he has the checks. He just can't deposit them until he gets the word from the minister."

c. On that same day, on or about November 9, 2009, at approximately 6:37 p.m., they spoke again. STARR stated, "We're still waiting. Now we just need one more approval." Client-7 also asked about "two companies which you said they were loans, Sundown and River, oh, Wind River ... Can we get the loan documents?" STARR replied "absolutely" and said he had to speak to "[Associate-4]."

d. On or about Tuesday, November 10, 2009, at approximately 11:06 a.m., Client-7 and STARR spoke by telephone. STARR stated, "We got the clearance from one group. We're just waiting for the clearance from the other. He is picking them up

---

[5] The descriptions of the recorded calls set forth herein are based on my review of the recordings.

[6] Associate-6 is believed to be a principal of Universal.

right now." Later in the call, STARR stated: "[T]he only question is us getting the permission of the ministers over there to deposit it and that's what we're waiting for."

     e.   Later that day, on or about November 10, 2009, at approximately 12:06 p.m., they spoke again. STARR said that they were "speaking to them [the ministers] as we speak." Client-7 also asked about "[Associate-4]." STARR said that Associate-4 was the attorney, and that he had "a call in to him already."

     f.   On or about Monday, November 16, 2009, at approximately 1:41 p.m., Client-7 spoke to STARR by telephone. STARR stated that his son "is heading down there as we speak . . . to D.C." Client-7 asked, "Wasn't he here? Wasn't he supposed to come and see you on Friday with a check?" STARR replied, "He was here and they made him go down, the vice president of the country made him go down to Florida." STARR added that "they called the vice president of the country who happened to be coming into the U.S. and so the check is sitting in the valise of the vice president who is a close friend of [Associate-6]'s dad who is releasing it to [Associate-6]." STARR further described the situation at length, adding "so we know 110 percent they [the checks] exist." Client-7 replied, "It's kinda not making sense anymore." STARR replied "try being at this end of it" and added "You saw me, we have the same interest in it, I am beyond stressed on this." Client-7 later returned to the subject of the loan documentation, asking: "When can I get the loan documents?" STARR said that he would give them a call and it should be "instantaneous."

     g.   On or about Tuesday, November 17, 2009, at approximately 6:20 p.m., Client-7 spoke to STARR by telephone. STARR stated that Client-7 would get the check the next day.

     h.   On or about Wednesday, November 18, 2009, at approximately 10:35 a.m., Client-7 spoke to STARR by telephone. Client-7 stated, "Good morning." STARR replied, "I think it is. 60 minutes. She is with them right now. They are arranging for him to get the check and he is calling me back as soon as it is handed to them." Later in the call, STARR stated, "He just texted me that he is just sitting down now with the vice minister and they are just waiting for the vice president to wake up and come downstairs and give them a kiss goodbye and be handed his check." On the subject of the loan documentation, STARR stated: "I spoke to [Associate-4] and he is getting them both over here."

     i.   On or about Thursday, November 19, 2009 at approximately 3:41 p.m., Client-7 spoke to STARR by telephone.

STARR explained, "He will be given the check before the end of today. I believe after he receives the check he should go to Caracas to thank the various people there. . . . the vice president flew him back down to Fort Lauderdale last night." Later in the call, STARR stated: "[H]e's waiting with a brigadier general who is supposed to escort him there, get him his check, get him on a plane and send him back up here. So the chance of it not happening, on a scale of 1 to 100, this time is zero." STARR added, "He has one of two checks. He has the smaller check. He has a check for $4 million, which we don't want to put in until we get the bigger check. And he's seen them both, and we saw a copy of it. So we know it exists. . . It's made out to our company, we absolutely know all of that."

      j.   On or about Friday, November 20, 2009 at approximately 11:01 a.m., Client-7 spoke to STARR by telephone. STARR stated that she would be getting approximately "6 million bucks" but that "they made him fly believe it or not to Caracas to get it." Client-7 asked, "Didn't he have the check already in his hands yesterday?" STARR confirmed that he did, but that "the vice president would like [Associate-6] to ... personally go to Caracas to thank him for his help." Later in the call, STARR promised, "The other thing is that three weeks from Friday you will be getting another check for a little more than $3 million." He added:

> So what you will be getting over the next three and a half weeks will be approximately $9 million and then next year he has already booked in 12 million for you. That's between ... Colombia, Honduras and Peru and the following year is Mexico . . . Mexico is a 450 for 130 bucks. Mexico is about a $30 million check to you."

Later in the call, STARR stated that he would go see Client-6 in prison. STARR spoke at length about further deals. He then described how the check would be deposited: "So [my son] will know on Monday whether or not this thing can clear by Wednesday. We've already chartered a plane for him - for him to go out to Minneapolis because that's a direct deposit." He added, "I love you a lot. Tell [Client-6] . . . I love him."

      k.   On or about Wednesday, November 25, 2009, at approximately 11:00 p.m., Client-7 spoke to STARR by telephone. STARR stated that the check had been deposited but that because of Thanksgiving it would not clear until the following week. He added that it would take time because of its size - "it's like a

38 million dollar check ... for whatever the hell reason Wells
Fargo does not have any facility - that's why we flew out to Flow
Creek, Minnesota, which is where we had to deliver it ... there
or deliver it to Portland in order to get it in the system.
Otherwise it would have taken eight days to clear."  Toward the
end of the call, Client-7 again asked for the "loan documents."
STARR stated that he did not have them; that "[Associate-4] is
holding them."

## THE NATURE OF CLIENT-6 AND CLIENT-7'S INVESTMENTS WITH STARR

23.    In order to understand the nature of the
investments to which KENNETH STARR, the defendant, purportedly
directed Client-6 and Client-7's money, I have examined multiple
sets of records.  These include documents that Client-6 and
Client-7 maintained and gathered concerning the STARR
investments, which comprise documents they received from STARR,
bank records they maintained, and public records they have
obtained.  I have also reviewed bank documents and interviewed
witnesses, including STARR.  Based on these materials, I have
concluded that, in many cases, STARR misappropriated large
portions of Client-6 and Client-7's investments for himself and
his associates.  In other cases, he invested their monies in
questionable and suspicious investments, often with a direct
benefit to himself, his wife and/or associates.  While more is
known about certain investments than others, it appears that all
of the investments are tainted by fraud.  Herein I review some of
the information that I have learned about several of those
investments: Wind River LLC; Glassnote Entertainment Group LLC;
Sundown Hills LLC; Bregman Productions Inc.; Universal
Identification Solutions LLC; and Martini Park.

a.    Wind River LLC

24.    From bank records and interviews, I have learned
that acting at the direction of KENNETH STARR, the defendant,
Client-7 caused a wire transfer of $150,000 to Wind River LLC on
or about February 28, 2008.  In a recent review of documents
provided by STARR to Client-6 and Client-7 sometime after
November 2009, I have learned that in connection with Client-6
and Client-7's investments, STARR provided Client-7 a "demand
promissory note" from Wind River LLC.  The note bears the
handwritten date of January 21, 2010, next to a crossed out date
of February 28, 2009.  This is almost 2 years after the purported
loan was granted.  The note appears to be signed by ANDREW STEIN,
the defendant.  There is no signature block for Client-6 and
Client-7 on the note.  The amount on the note is $150,000,
corresponding to the February 28, 2008, wire transfer.

21

25.    In the interview on or about May 11, 2010, Client-6 stated that he never had a conversation with KENNETH STARR, the defendant, about loaning money to anyone.  He further stated that he did not know what Wind River was.

26.    Based on incorporation papers for Wind River LLC, I have learned that it was incorporated in Delaware on or about February 13, 2008, by Associate-4.

27.    During the interview on or about March 10, 2010, KENNETH STARR stated that Wind River LLC was opened, possibly by a STARR & CO. employee ("Associate-7"), after ANDREW STEIN, the defendant, indicated a desire to form a new company.  KENNETH STARR, the defendant, stated that funds going to Wind River LLC were loans to STEIN and fees earned by STEIN in connection with his work as a "placement agent" for investments.

28.    Based on a review of bank records I have obtained in this case, I have learned that between on or about February 27, 2008 and on or about March 31, 2009, Wind River LLC received approximately $1.6 million from, among other sources, Client-7, KENNETH STARR, the defendant, Marose LLC, and Associate-3.  Those monies were then all withdrawn to pay for the extravagant personal expenses of ANDREW STEIN, the defendant, including hundreds of thousands of dollars to pay American Express bills on a card ANDREW STEIN, the defendant, used that was held in the name of a third party and used to pay rent, doctors' bills, pharmacy expenses, and restaurant bills.

29.    I have further learned during the interview of KENNETH STARR, the defendant, on or about March 10, 2010, that Marose LLC is a vehicle that STARR and Associate-3 use to make investments.

30.    Client-6 and Client-7 have received no payments in return for this $150,000 investment in Wind River LLC.

b.    Glassnote Entertainment Group LLC ("Glassnote")

31.    From records provided by Client-6 and Client-7 and interviews, I have learned that, acting at STARR's direction, Client-7 caused wire transfers to Glassnote of $500,000 on or about February 7, 2008, $500,000 on or about March 12, 2008, and $250,000 on or about September 5, 2008.  Client-6 and Client-7 have an unexecuted Subscription Agreement.  An Amended and Restated Limited Liability Company Agreement dated April 6, 2007 lists, among others, the following members (and associated percentage of ownership) of Glassnote: STARR's Wife (14.4%),

22

ANDREW STEIN, the defendant, (5.0%), and Associate-3 (5.0%). Client-6 and Client-7 received a 2008 Form 1065, Schedule K-1 that, as partners in Glassnote, indicated a loss of $76,588 in the 2008 tax year. They also received a 2009 Form 1065, Schedule K-1 that indicated a loss of $762,803 in the 2009 tax year. According to Client-6 and Client-7, during the May 11, 2010, interviews, Client-6 and Client-7 have seen no return on this investment.

     32. On or about March 30, 2010, I interviewed the chief financial officer and general manager of Glassnote ("Glassnote CFO"). Based on that interview, I learned the following:

     a. Glassnote was formed about 3 years earlier by Glassnote CFO and another individual ("Glassnote Founder"). Glassnote Founder has over 30 years of experience in the music business and has signed very successful music artists. Glassnote specializes in finding new artists and providing the money to sell records and merchandise.

     b. When Glassnote Founder and Glassnote CFO started Glassnote, they approached KENNETH STARR, the defendant, to help identify investors to buy 50% of Glassnote. STARR identified a group of five initial investors who contributed a total of $1.5 million. This group included the following two investors (and investor amounts):

          i. ANDREW STEIN, the defendant, ($150,000)
          ii. Associate-3 ($150,000)

     c. Sometime later, Glassnote needed a second round of investments. STARR got Client-7 to invest $1.25 million. After this investment, the investors recruited by STARR owned approximately 60% of Glassnote.

     d. As part of the deal negotiated with Glassnote, Glassnote agreed to hire STARR's Wife. Glassnote paid her $150,000 to work as a consultant for one year. STARR's Wife had no real responsibility and showed up once per month. STARR's Wife introduced two bands to Glassnote, and Glassnote lost money on both.

     e. In its initial years, Glassnote generated a little over $2 million in losses. The company was considering buying out the investors with the funds it received from the renewal of a distribution agreement.

33.  Based on a document maintained by STARR & CO., I have learned that monies were wired to STARR's Wife on behalf of Glassnote as recently as August 4, 2008.

c.   Sundown Hills LLC

34.  From records provided by Client-6 and Client-7 and interviews, I have learned that acting at the direction of KENNETH STARR, the defendant, Client-7 caused wire transfers of $100,000 to Sundown Hills on or about February 12, 2008. Based on recorded calls, transcripts of which I have reviewed, I have learned that STARR subsequently told Client-6 and Client-7 that this was a loan.  Client-6 and Client-7 have obtained a bankruptcy filing for Sundown Hills LLC signed by a retired prominent basketball player ("Basketball Player") in the Northen District of Georgia in or about January 2010.  The filing enumerates the largest 20 unsecured creditors.  Client-6 and Client-7 are not listed.  Starr & Company is listed as being owed $238,877.  According to Client-6 and Client-7 during the interviews on or about May 11, 2010, Client-6 and Client-7 have seen no return on this investment.

35.  During his interview on or about May 11, 2010, Client-6 informed me that he knew that KENNETH STARR, the defendant, and the Basketball Player were close friends, and that the Basketball Player owned a golf course.  On one occasion, Client-6 and his wife had lunch with the Basketball Player at the golf course, a lunch that was arranged by STARR.  Client-6 and Client-7 were unaware at the time of the payment that STARR was loaning their monies to anyone.

d.   Bregman Productions Inc. ("Bregman")

36.  From records provided by Client-6 and Client-7 and interviews, I have learned that acting at the direction of KENNETH STARR, the defendant, Client-7 caused wire transfers of $200,000 to Bregman on or about March 7, 2008. According to a two-page letter agreement, the investment was for the development of certain movies that a prominent movie producer (the "Producer") "is planning to try to set up and/or produce, but does not currently have the right to set up and/or produce."  The document lists the following film projects: "Mo Schneider," "The Gold Coast," "Tapping the Source," "Desert Rose," and "Drop Dead Gorgeous."  According to Client-6 and Client-7, during the interviews on or about May 11, 2010, Client-6 and Client-7 have seen no return on this investment.

24

37.    Based on publicly available information, including
the website imdb.com, I have learned that the Producer has not
produced a released movie since in or about 2005.

38.    According to an article published in the *New York
Daily News* on or about November 22, 2005, another individual and
the Producer hosted a birthday party for STARR's Wife.   The
article also described STARR's Wife as "producing a major motion
picture, 'Desert Rose,' based on Larry McMurtry's novel about an
aging Las Vegas showgirl, with famed power producer [the
Producer]."

     e.   <u>Universal Identification Solutions LLC</u>

39.    From records provided by Client-6 and Client-7 and
interviews, I have learned that, acting at the direction of
KENNETH STARR, the defendant, Client-7 caused the following wire
transfers to be made into the account for Universal
Identification Solutions LLC at Gibraltar Bank in Florida ending
in 1731 (the "Universal 1731 Account"):

     a.    $1,000,000 on or about March 25, 2008;
     b.    $500,000 on or about March 27, 2008;
     c.    $250,000 on or about September 24, 2008;
     d.    $150,000 on or about September 25, 2008; and
     e.    $100,000 on or about October 1, 2008.

40.    Based on a review of those same bank records, I
have also learned that additional deposits were placed in the
Universal 1731 Account between on or about March 20, 2008, and on
or about January 29, 2010, including:

     a.    ANDREW STEIN, the defendant, deposited $161,000.
     b.    KENNETH STARR, the defendant, deposited $11,000.
     c.    Marose, LLC deposited $388,300.
     d.    Associate-3 deposited $198,000.
     e.    Riben Ventures deposited $100,000.
     f.    Associate-1 deposited $246,750.

Based upon documents I have reviewed, I believe that Riben
Ventures is affiliated with STARR's son, Associate-1.

41.    Based on a review of those same bank records, I
have also learned that the following withdrawals, among others,
were made from the Universal 1731 Account between on or about
March 20, 2008, and on or about January 29, 2010, including:

     a.    Wind River LLC received $200,000.

b.    KENNETH STARR, the defendant, received $270,000.
c.    Marose, LLC, received $50,000.
d.    Associate-3 received $170,000.
e.    Associate-1 received $50,000.
f.    Associate-6 received $207,156.66.

Other monies were then transferred into accounts that have
similar names to Universal, suggesting that those additional
accounts might fund an actual operating entity.

        42.    Based on a review of those same bank records, I
have also learned that the Universal 1731 Account was opened on
or about March 20, 2008.  The signatories on the account are
KENNETH STARR, the defendant, and his son, Associate-1.  This was
only five days before Client-6 and Client-7's first deposit.

        43.    Based on the interview of Client-6 on or about May
11, 2010, I have learned that KENNETH STARR, the defendant, told
Client-6 that "Universal" was an investment in voting machines.
Based on the interview of Client-7 on or about May 11, 2010, I
have learned that STARR told Client-7 that "Universal" was
involved in voting machines, that the whole world was interested
buying them, and that they [Client-6 and Client-7] were going to
make a lot of money.

        44.    As set forth above, between at least on or about
November 6, 2009, through at least on or about November 25, 2009,
Client-7 had repeated conversations with KENNETH STARR, the
defendant, in which STARR stated that Universal's sales in
Venezuela had earned significant monies and that a return on
Client-6 and Client-7's investment was imminent.  Specifically,
STARR repeatedly promised that Client-6 and Client-7's investment
in Universal Identification Solutions was about to realize a
multi-million dollar pay-off, but then offered a series of
shifting and far-fetched explanations for why the payment could
not be made.

        45.    During his interview on or about March 10, 2010,
at the U.S. Attorney's Office, KENNETH STARR, the defendant,
stated the following with respect to this investment entity:

        a.    "Universal Identifications Systems" makes
identifications systems and the product is marketed outside the
United States.

        b.    The company earned approximately $1 million in
sales over a three-year period.  STARR did not mention any of the

26

more substantial income that he described to Client-7 in the calls recorded only four months earlier.

       c.   The owners are STARR, Associate-1, Associate-3, Associate-6, and a fourth individual. STARR did not mention Client-6 and Client-7 or their investment vehicle, Challenger III.

       d.   The company does its banking at Wells Fargo.

       e.   The company sent ANDREW STEIN, the defendant, $200,000 by mistake, but STEIN paid the money back. STARR further explained that he (STARR) had wanted to loan money to STEIN and that the money was wired out of the wrong account.

     46.   Based on documents provided by Client-6 and Client-7, I have learned that KENNETH STARR, the defendant, provided them a letter stating that the $3 million in Universal Identification Solutions and a second $3 million investment could "both be liquidated within a five day period."

     47.   Client-6 and Client-7 have received no payments in return for their $2,000,000 payment to Universal Identification Solutions.

       f.   <u>Martini Park LLC.</u>

     48.   According to documents provided by Client-6 and Client-7, they invested approximately $3,000,000 in Martini Park in five installments in the amounts, and on or about the dates, indicated below:

| June 12, 2008 | $ 800,000 |
| June 12, 2008 | $ 200,000 |
| June 10, 2008 | $ 400,000 |
| June 9, 2008 | $ 200,000 |
| April 21, 2008 | $ 1,400,000 |

The payments were wired to Martini Park Management, LLC, at account #20009305 at Gibraltar Private Bank. Client-6 and Client-7 were provided with an offering document that described Martini Park as a "lounge business" dedicated to "build, own and operate what it believes is a unique lounge concept." The offering document indicated that the expected gross proceeds from the offering was estimated to be $4,953,000. According to

Client-6 and Client-7 during their interviews on or about May 11, 2010, Client-6 and Client-7 have seen no return on this investment.

49.    Martini Park documents indicate that STARR's Wife was an employee of Martini Park from in or about 2006 through at least in or about 2008.

50.    Based upon interviews with Client-6 and Client-7, and based upon my review of bank records and other documents, I have learned that Client-6 and Client-7 have received no return on any of their investments with KENNETH STARR, the defendant, except for a return of approximately $119,560 paid to them on a $2 million investment not discussed herein.

## OVERVIEW OF STEIN'S CRIMINAL SCHEMES

51.    From 1969 through 1993, ANDREW STEIN, the defendant, served as an elected public official in New York City and New York State.    From 1969 through 1972, STEIN represented the 62nd District in the New York State Assembly.    From 1973 through 1977, he represented the 65th District in the New York State Assembly.    From 1978 through 1985, he served as the Borough President of Manhattan.    From 1986 through 1993, STEIN served as President of the New York City Council.    His career as a public official ended after a brief run for Mayor of New York City in 1993.

52.    Beginning in at least 2000, ANDREW STEIN, the defendant, worked as a consultant for various investment companies.    These companies paid STEIN millions of dollars in "placement fees" in exchange for his help in brokering agreements between public pension funds and investment funds.    During that time, as set forth in greater detail below, ANDREW STEIN repeatedly failed to claim all of his income to the Internal Revenue Service ("IRS") and failed to pay all taxes owed on the income reported by others on his behalf.    The IRS undertook various collection efforts starting in at least 2004.    As the pace of the IRS efforts intensified, STEIN took steps to shield his income and expenditures from scrutiny.    These efforts included the creation of the shell corporation called Wind River LLC (described above); the rapid movement of monies between multiple bank accounts; and the use of third parties' credit cards in order to pay his own personal expenses.    STEIN also made material false statements concerning these matters on two occasions.    First, in filing a Form 433-A on or about April 10, 2008, in response to questions that called for such information, he failed to disclose the existence of Wind River LLC; his use of

28

a Wind River LLC bank account; his use of credit cards held in the names of third parties; and his rental of a summer luxury property.  Second, in response to questions from federal officers including me on or about November 9, 2009, STEIN claimed to have no knowledge of Wind River LLC and denied being an officer of Wind River LLC.

## BACKGROUND ON STEIN'S TAX DEBTS

53.    Based on my review of records maintained by the IRS, I have learned that as of December 15, 2009, ANDREW STEIN, the defendant, owed $2,174,672.04 in past due taxes for the tax years, 2003, 2005, 2006, 2007, 2008, and 2009.  I have further learned that he owed these monies because in many years he filed tax returns, but made little or no payments in connection with the taxes he owed.  STEIN was also assessed for income that he never claimed and that the IRS discovered after STEIN filed his taxes.  Finally, I have learned from bank records and records obtained from third parties that STEIN failed to report approximately $655,000 earned over tax years 2003 though 2007.

54.    Specifically, based on IRS records I have learned that:

a.    On or about October 18, 2004, ANDREW STEIN, the defendant, submitted his U.S. Individual Tax Return Form 1040 for the Calendar Year 2003 ("2003 Return").  In the 2003 Return, STEIN reported total income of $1,500,643.  After crediting STEIN for $78,713 in withholdings, STEIN owed tax payments of $441,271, including $11,154 in household employment taxes.

b.    On or about October 19, 2005, ANDREW STEIN, the defendant, submitted his U.S. Individual Tax Return Form 1040 for the Calendar Year 2004 ("2004 Return").  STEIN reported total income of $920,922.  The 2004 Return reported that, after crediting STEIN for $79,148 in withholdings and $180,000 in estimated payments, STEIN owed tax payments of $30,745, including $12,091 in household employment taxes.

c.    On or about September 16, 2006, ANDREW STEIN, the defendant, submitted his U.S. Individual Tax Return Form 1040 for the Calendar Year 2005 ("2005 Return").  STEIN reported total income of $1,495,733. The 2005 Return reported that, after crediting STEIN for $76,021 in withholdings, STEIN owed tax payments of $443,966, including $12,496 in household employment taxes.

d.    On or about October 19, 2007, ANDREW STEIN, the defendant, submitted his U.S. Individual Tax Return Form 1040 for the Calendar Year 2006 ("2006 Return").   STEIN reported total income of $1,639,795.   The 2006 Return reported that, after crediting STEIN for $75,308 in withholdings and $300,000 in estimated payments, STEIN owed tax payments of $167,514, including $12,412 in household employment taxes.

e.    On or about October 20, 2008, ANDREW STEIN, the defendant, submitted his U.S. Individual Tax Return Form 1040 for the Calendar Year 2007 ("2007 Return").   STEIN reported total income of $1,561,348. No taxes were withheld or paid in advance for Calendar Year 2007.  He owed tax payments of $572,842, including $12,504 in household employment taxes.

55.   Based on publicly available records I have learned that as a result of the tax debts of ANDREW STEIN, the defendant, the IRS filed a series of liens against STEIN.   Specifically:

a.    On or about March 15, 2005, the IRS filed a tax lien in the amount of $480,240 in connection with STEIN's tax debt.

b.    On or about September 25, 2007, the IRS filed a tax lien in the amount of $544,823 in connection with STEIN's tax debt.

c.    On or about May 15, 2008, the IRS filed a tax lien in the amount of $208,393 in connection with STEIN's tax debt.

d.    On or about April 24, 2009, the IRS filed a tax lien in the amount of $538,379 in connection with STEIN's tax debt.

56.   Based on an IRS letter dated March 26, 2008 to ANDREW STEIN, the defendant ("March 26, 2008 Letter"), I have learned the following:

a.    On or about January 12, 2007, STEIN, through his attorney, requested the reinstatement of a prior agreement that required STEIN to pay $16,000 per month, starting on November 21, 2006 in order to pay past due taxes.   The original agreement provided that the IRS could cancel the installment agreement in the event that STEIN failed to make a scheduled monthly payment or failed to pay other federal taxes due.

b.    On or about September 20, 2007, the IRS mailed STEIN a Letter 1058, notifying STEIN of its intent to levy his

assets and earnings in connection with unpaid taxes owed for earlier calendar years. As of that date, STEIN had failed to make the payments set out in the original installment agreement; he had incurred additional liability in connection with calendar year 2004; and he failed to make required estimated tax payments for calendar years 2006 and 2007.

      c. Subsequently, and in response to the Letter 1058, STEIN requested a Collection Due Process hearing. STEIN, through his attorney, challenged the levy stating that he had previously been granted an installment agreement for the 2004 and 2005 calendar years. In a teleconference on or about January 30, 2008, STEIN, through his attorney, requested a new installment agreement for tax years 2003, 2005, 2006 and 2007.[7] STEIN offered to pay $25,000 per month plus three additional $100,000 payments per year. The IRS requested that by February 11, 2008, STEIN complete Form 433-A, a "Collection Information Statement for Wage Earners and Self-Employed Individuals" that calls for the submission of certain personal and financial information.

      d. As of the date of the March 26, 2008 Letter, STEIN had not submitted the Form 433-A to the IRS. The IRS thus denied STEIN's request for a new installment agreement. The IRS further determined to impose a levy in order to collect an outstanding balance of approximately $466,967.

### STEIN MADE MATERIAL FALSE STATEMENTS ON A 2008 FORM 433-A IN CONNECTION WITH HIS EFFORTS TO RECEIVE APPROVAL OF A PLAN TO PAY OFF HIS TAX DEBTS

      57. Based on records maintained by the IRS, I have learned that on or about April 10, 2008, ANDREW STEIN, the defendant, filed a Form 433-A ("2008 Form 433-A") in connection with his efforts to establish a new payment plan and to avoid imposition of IRS levies. From a review of the 2008 Form 433-A, I have learned the following:

      a. Section 4 of 2008 Form 433-A requires that the applicant detail certain "Personal Asset Information." Question 12 states: "Include all checking, online bank accounts, money market accounts, savings accounts, store value cards (e.g., payroll cards, government benefit cards, etc.)." In response, STEIN listed only a checking account at Chase with a negative balance of $34,992.39.

---

[7] The tax debt for 2004 had been satisfied through payments under the installment agreement.

b.    Question 13 requires that the applicant detail all "Investments." STEIN listed no investments.

c.    Question 14 requires that the applicant detail all "Available Credit" and provides, "List bank issued credit cards with available credit." STEIN indicated that he had none.

d.    Question 17 requires that the applicant detail all "Real Property Owned, Rented and Leased." STEIN listed only the rental of his primary residence on the Upper East Side of Manhattan for a monthly rent of $18,000.

e.    Questions 33 through 45 require the applicant to detail actual monthly expenses. STEIN listed total monthly expenses of $51,324.

f.    STEIN signed the 2008 Form 433-A and dated it April 10, 2008. Above his signature, the form reads: "Under penalties of perjury, I declare that to the best of my knowledge and belief this statement of assets, liabilities, and other information is true, correct, and complete."

## A.    STEIN Failed To Disclose The Existence of Wind River, LLC On the 2008 Form 433-A

58.    Based upon Delaware incorporation documentation provided by STARR & CO., I have learned that on or about February 13, 2008, a lawyer ("Associate-4") incorporated Wind River LLC in Delaware.

59.    Based upon bank records, I have learned that on or about February 27, 2008, STEIN opened a bank account for Wind River LLC at Bank of America. In the account opening documents, STEIN estimated that Wind River LLC's annual income would be approximately $2 million. STEIN listed himself as the "managing member" of Wind River LLC. The Wind River LLC account at Bank of America was closed on March 31, 2009.

60.    On or about March 10, 2010, I participated in an interview of KENNETH STARR. During that interview, STARR stated that Wind River LLC was opened, possibly by a STARR & CO. employee ("Associate-7"), after ANDREW STEIN, the defendant, indicated a desire to form a new company. STARR stated that funds going to Wind River LLC constituted loans to STEIN and placement fees earned by STEIN in connection with his work as a "placement agent" for investments.

61.  I have reviewed a number of documents that indicate that ANDREW STEIN, the defendant, identified himself as serving in an official capacity at Wind River LLC.  First, bank records reflect that when STEIN opened a business economy checking account for Wind River LLC at Bank of America on or about February 27, 2008, STEIN indicated that he was the "Managing Member" of Wind River LLC.  Second, when STEIN opened a bank account for Wind River LLC at City National Bank on or about April 2, 2009, STEIN indicated that he was the "Manager" of Wind River LLC.  Third, when the Internal Revenue Service assigned an employer identification number to Wind River LLC, notice of the assignment was mailed to Wind River LLC on or about February 26, 2008, and Andrew Stein was the only individual listed as a member connected to Wind River LLC.

62.  Based on Bank of America records, I have learned that during the period that the Wind River LLC account was open, approximately $1.6 million was deposited into the account and then withdrawn to cover what appear to be STEIN's personal expenses.  Over approximately a 13-month period, disbursements were made to, among others, the following recipients in the amounts indicated below:

| | |
|---|---|
| Associate-8 (defined below) | $276,500.00 |
| Marose LLC | $155,000.00 |
| Summer rental home (discussed below) | $151,500.00 |
| Associate-9 (defined below) | $121,901.54 |
| ATM machines | $ 77,171.26 |
| Associate-2 (defined below) | $ 45,750.00 |
| Teller Cash Withdrawals | $ 37,350.00 |
| Checks to STEIN | $ 20,000.00 |
| STEIN's son | $ 10,000.00 |
| Duane Reade | $ 6,034.55 |
| Continental Airlines | $ 3,438.50 |
| Checks to Cash | $ 3,100.00 |
| Polo stores | $ 2,782.95 |
| EZ Pass | $ 2,215.47 |

| Delta Airlines | $ 1,597.50 |
| Shell Oil | $ 1,111.29 |
| Food Emporium | $ 1,037.68 |
| Cambridge Chemists | $ 910.60 |
| US Air | $ 639.50 |
| Zitomer Pharmacy Inc. | $ 623.87 |
| Citarella | $ 617.77 |
| Gracious Home | $ 587.82 |
| 90th Street Pharmacy | $ 205.50 |

63.    Based on my review of the 2008 Form 433-A, I have learned that ANDREW STEIN, the defendant, did not disclose the existence of Wind River LLC or the existence of the Wind River bank account at Bank of America.  Specifically, the section titled "Employment Information" did not list Wind River LLC and the section titled "Business Information" for self-employed tax payers was left blank.  The only bank account listed, as set forth above, was the Chase account in STEIN's name with a negative balance.

**B.    STEIN Failed to Disclose His Use Of Third Party Credit Cards In The 2008 Form 433-A**

64.    Based on the investigation to date, and as set forth in greater detail below, I have learned that STEIN regularly used and had access to credit cards in the names of other individuals.  STEIN used those third party credit cards to pay for hundreds of thousands of dollars in apparently personal expenses.  Some of these credit cards existed solely for the use of STEIN and Associate-2.  STEIN did not disclose the existence of these cards to the IRS in the 2008 Form 433-A.

65.    On or about November 9, 2009, I participated in an interview of a family friend of ANDREW STEIN, the defendant. Based on the interview of that family friend ("Associate-8"), I learned the following:

a.    Associate-8 and his wife make a small amount of money.  Their income consists of social security and a small amount of money they make from his wife's company.

34

b.    Associate-8 maintained an American Express account ("American Express Account"), and different credit cards were issued under different names in connection with that American Express Account.  In or about 2002, ANDREW STEIN, the defendant, and Associate-2 were going through rough times financially.  It was at this time that Associate-2 and STEIN started using an American Express card issued in the name of Associate-8.  Either STEIN or Associate-2 physically controlled the card issued in the name of Associate-8 and they used it for both business and personal expenses.  Meanwhile, Associate-8 and his wife used a different card associated with the American Express Account; that other card was issued in the name of Associate-8's wife. Associate-2 and STEIN reimbursed Associate-8 not only for the expenses that they (Associate-2 and STEIN) had incurred, but for all of the charges included on all of the credit cards connected to the American Express Account, including the charges incurred by Associate-8 and his wife on the credit card issued in the name of Associate-8's wife.

c.    Several years prior to my interview of Associate-8, American Express inquired how Associate-8 could afford to pay the large expenses being incurred on the American Express Account given Associate-8's relatively low income. To persuade American Express that Associate-8 could in fact afford to pay for the expenses being incurred on the American Express Account, Associate-2 and STEIN listed Associate-8 as a partner in Wind River LLC.  Associate-8 never went to a bank or any office associated with Wind River LLC.  He did not recall signing any papers or checks associated with Wind River LLC.

66.  On or about December 8, 2009, I interviewed Associate-2's brother ("Associate-9").  Based on that interview, I learned that:

a.    On or about November 12, 2007, Associate-9 was at a dinner with ANDREW STEIN, the defendant, and others.  The party attending the dinner tried to pay for their meals using cards in the name of Associate-8 and Associate-2 and the cards were rejected.   Associate-9 agreed to pay the bill using his own American Express card.  Soon after, STEIN began requesting that Associate-9 use Associate-9's card for charges incurred on STEIN's behalf, including travel, hotel stays, and restaurants. STEIN told Associate-9 that his (STEIN's) American Express card could not be used due to late payments on the account.  STEIN also repeatedly stated that he had deals going through that would enable him to reimburse Associate-9 soon.  Associate-9 believed that STEIN was "well off" and agreed to pay for STEIN's expenses.

35

   b.   Although Associate-9 was reimbursed for some of the charges he incurred on behalf of ANDREW STEIN, the defendant -- reimbursed by Associate-2, Wind River LLC, or STEIN's son -- eventually STEIN stopped reimbursing Associate-9 for all the charges Associate-9 was incurring on STEIN's behalf.  Associate-9 ultimately had to borrow money, including from his own retirement fund, to cover the expenses he incurred on STEIN's behalf.

   **C.   STEIN Failed To Disclose A Summer Rental Home In The 2008 Form 433-A**

   67.   As set forth above, ANDREW STEIN, the defendant, listed only a single rental of real property in the 2008 Form 433-A, namely, his personal residence in New York, NY.  In fact, both before and after STEIN signed the 2008 Form 433-A, he made payments for an additional luxury rental property in Bridgehampton, New York.  Further, I have learned that STEIN knowingly or unknowingly used proceeds of the investment fraud perpetrated by KENNETH STARR, the defendant, in order to rent that luxury property in Bridgehampton.

   68.   On or about November 23, 2009, I participated in an interview of the vice president of a certain company ("Company").  During the interview, I learned the following:

   a.   The principal of the Company owns a home in Bridgehampton, New York ("Bridgehampton Home").  STEIN rented the Bridgehampton Home for the summer seasons in 2007, 2008, and 2009.

   b.   For the 2008 summer season, STEIN paid the Company at least $150,000 to rent the Bridgehampton home.

   69.   I have reviewed the records for the Wind River LLC account at Bank of America.  Based on those records, I have learned of the following transactions, among others:

   a.   On February 28, 2008, Wind River LLC received a $150,000 wire transfer from Client-7 into the Bank of America account.

   b.   On February 29, 2008, $60,000 was wired from Wind River LLC to the Company.

   c.   On May 16, 2008, Wind River LLC received a wire transfer from Universal Identification Systems of $200,000.

    d.  On or about May 20, 2008, $91,500 was wired from Wind River LLC to the Company.

## IN OR ABOUT NOVEMBER 2009, STEIN MADE FALSE STATEMENTS CONCERNING WIND RIVER LLC TO FEDERAL OFFICERS

    70.  On or about November 9, 2009, a Criminal Investigator with the U.S. Attorney's Office for the Southern District of New York ("Investigator") and I approached ANDREW STEIN, the defendant, in the lobby of his apartment building on the Upper East Side of Manhattan.  I advised STEIN that he was a subject of a Grand Jury investigation investigating, among other things, his American Express charges and financial transactions associated with those charges.  I further advise STEIN that additional individuals/entities were also under investigation including, among others, Wind River LLC, Associate-2, Associate-8, and Associate-9.  STEIN falsely denied knowing, among others, Wind River LLC, Associate-2, Associate-8, and Associate-9. Further, when I attempted to serve STEIN with a Grand Jury subpoena issued to Wind River LLC, STEIN falsely denied being an officer of Wind River LLC and refused to accept service of the Grand Jury subpoena.

    WHEREFORE, deponent prays that KENNETH STARR and ANDREW STEIN, the defendants, be arrested and imprisoned or bailed, as the case may be.

ROBERT BERANGER
Special Agent
Internal Revenue Service

Sworn to before me this
26th day of May 2010

HON. DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

37